# DECLARATION OF MEGHANN BOYLE

1. I am the Director of the Boston Sub-Office of the Asylum Division within U.S. Citizenship and Immigration Services (USCIS), U.S. Department of Homeland Security (DHS). I make this declaration based on my personal knowledge and my review of official documents and records maintained by USCIS. If called to testify, I could and would do so competently.

2. The Asylum Division is a component of USCIS that:

    (1) adjudicates applications for asylum pursuant to 8 U.S.C. § 1158 (including applications by unaccompanied alien children (UACs) for which the Asylum Division has original jurisdiction pursuant to 8 U.S.C. § 1158(b)(3)(C));

    (2) conducts screening determinations regarding whether particular individuals have a reasonable fear of persecution or torture pursuant to the regulations at 8 C.F.R. § 208.31;

    (3) conducts screening determinations regarding whether particular individuals have a credible fear of persecution or torture upon return to their countries of origin pursuant to, 8 U.S.C. § 1225(b)(2)(B) and the regulations at 8 C.F.R. § 208.30; and

    (4) adjudicates applications for relief under section 203 of the Nicaraguan Adjustment and Central American Relief Act (NACARA), enacted as title 2 of Pub. L. No. 105-100, 111 Stat. 2160, 2193 (1997) (as amended by Technical Corrections to the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-139, 111 Stat. 2644 (1997)).

4. The Asylum Division is composed of a cadre of specially trained adjudicators known as Asylum Officers. By statute and regulation, Asylum Officers must receive training on international human rights law, non-adversarial interview techniques, and country conditions information. *See* 8 U.S.C. § 1225(b)(1)(E); 8 C.F.R. § 208.1(b). To assist officers the Asylum Division also maintains a publicly available manual entitled the Affirmative Asylum Procedures

1

Manual ("AAPM") available at https://www.uscis.gov/sites/default/files/files/nativedocuments/Asylum_Procedures_Manual_2013.pdf. The AAPM provides a comprehensive explanation of the various processes and procedures involved in the adjudication of an asylum application and covers topics from the initial submission of an application through the service of the agency's decision.

**Asylum Eligibility**

5. Any alien in the United States (other than aliens present in the Commonwealth of the Northern Mariana Islands) who meets the definition of a refugee, warrants a positive exercise of discretion, and is not otherwise statutorily barred, is eligible for asylum. *See* 8 U.S.C. § 1158(b). Pursuant to statute, such an alien must file an application for asylum within one year of his or her arrival in the United States unless extraordinary circumstances or changed country conditions exist. *See* 8 U.S.C. § 1158(a)(1)(C) and (D).

6. To qualify for asylum, an applicant must establish that she is a refugee who is unable or unwilling to return to her country of nationality, or last habitual residence if she has no nationality, because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1158(a)(2). This means that the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for her persecution or why she fear persecution. *See* 8 U.S.C. § 1158(b)(1)(B)(i).

**The Asylum Interview Process.**

7. The affirmative asylum process begins when the applicant submits an Application for Asylum and for Withholding of Removal (Form I-589) with United States Citizenship and

Immigration Service's Vermont Service Center.[1] The I-589 requests certain biographical information (such as the applicant's birth and family history, residences, education, employment, etc.), as well as information relating to the basis of her fear of persecution warranting a grant of asylum. *See* Ex A: Plaintiff's Asylum Application. In general, an applicant must provide information on whatever past persecution they may have endured or the reason why they fear any persecution in the future.

8. Upon receipt of the application, the Service Center enters the application data into the case tracking system known as RAPS (Refugee Asylum Parole System), creates an Alien file ("A file"), and forwards the case to the appropriate Asylum Office for interview. The interview is scheduled automatically by the Asylum Office using RAPS. The number of cases that are scheduled for an interview in any given month depends upon the number of officers available to conduct interviews on any given month. Officers are expected to conduct at least two interview per day. After an interview is scheduled in RAPS, the system automatically generates an interview notice, which is mailed to the applicant no less than 18 days before the scheduled interview date.

9. The interview is a non-adversarial proceeding that is conducted under oath. A non-adversarial proceeding is one in which the parties are not opposing each other. It differs from an adversarial proceeding, such as civil and criminal court proceedings, in which parties oppose each other by advocating their mutually exclusive positions before a neutral arbiter until one side

---

[1] This declaration addresses only the affirmative asylum process. There are other related processes, including defensive asylum applications (made while in removal proceedings while under the jurisdiction of the immigration judge), and credible and reasonable fear screenings (pre-screening processes under the expedited removal framework to screen for potential eligibility for asylum and other forms of humanitarian protection to comply with U.S. international treaty obligations). These related processes have their own distinct sources of guidance.

prevails and the other side loses. At the outset of the interview, the Asylum Officer informs the applicant of the purpose of the interview, the rights and responsibilities of those present, and what can be expected after the interview.

10. If the decision is to grant asylum, and the required security checks are complete, the Asylum Officer will prepare a grant assessment (summary of the case for the file), approval letter, and I-94 (Arrival Record/Departure Record).

11. If the decision is not to grant asylum and the applicant is not in lawful status, the officer prepares an assessment to refer, a referral notice, and a Notice to Appear in immigration court for removal proceedings, during which the applicant will have the opportunity to present their asylum claim de novo. 8 C.F.R 208.14(c)(1).

**How Questions Posed At The Interview Are Determined By The Agency.**

12. Given the very fact specific nature of each application, the agency does not employ a set script of questions for Asylum Officers to pose to applicants at the interview. Rather, during the interview, the Asylum Officer has an affirmative duty to elicit all information relevant to the applicant's claim. 8 C.F.R.§ 208.9. Although officers must cover all of the information requested in the application form, officers are trained that they should not simply ask the applicant the same questions as those on the form. Instead, officers use a variety of techniques that provide the applicant an opportunity to speak in his or her own words.

13. Additionally, officers must pursue all relevant lines of questioning, until they are certain that they have sufficient pertinent information to make a determination on the applicant's claim. Officers must also allow the applicants to ask questions as appropriate and to submit additional documents at the interview in support of his or her claim.

14. In conducting an interview the Asylum Officer is the only person who questions the applicant. The primary purpose of the interview is to determine whether the alien qualifies for

asylum. It is not the role of the officer to oppose the applicant's request or application. Because the process is non-adversarial, it is inappropriate for the officer to interrogate or argue with any applicant.

15. If any of the information in the form conflicts with the applicant's interview testimony, or if the officer notices inconsistencies within the applicant's interview testimony, the officer must give him or her an opportunity to explain the discrepancies. The officer must correct the application form when necessary, advising the applicant of the corrections.

16. The officer must also learn to distinguish between the likelihood that the applicant is confused and the possibility that his or her non-responsiveness is an attempt to receive a benefit by fraud. If the applicant does not appear to understand the officer's questions, the officer should ascertain whether there is a problem with the interpretation or with the phrasing of the question. However, if the applicant appears to understand the question and is being evasive or non-responsive, or presents inconsistent or implausible testimony, the officer must confront the applicant and give him or her an opportunity to explain.

**The Attorney's Role At The Interview**

17. An applicant or petitioner may be represented by an attorney or an accredited representative of a recognized organization. To attend the interview, the representative must file a properly completed Form G-28 Notice of Entry of Appearance as Attorney.

18. Because of the non-adversarial nature of the process, the role of the representative during the interview is minimal. The Asylum Officer controls the interview and will ask most of the questions. The officer may allow the representative to comment or ask questions during the course of the interview to clarify specific points. After the officer's last question, the officer will give the attorney an opportunity to offer a closing statement.

19. In certain instances it may be appropriate for the representative to comment during the

course of the interview to clarify issues. However, if the representative repeatedly interrupts or otherwise disrupts the interview, the officer should ask the representative to refrain from interrupting and explain that he or she will have an opportunity at the end of the interview to ask questions and make comments. With the concurrence of a Supervising Asylum Officer, an AO may ask a representative who continuously fails to abide by the rules after repeated warnings, to leave the interview. If the attorney is asked to leave, the AO either continues with the interview or suspends the interview at the applicant's request. If the interview is suspended, the rescheduling of the appointment is at the fault of the applicant, so the EAD clock stops.

**The Result If An Applicant Fails To Answer Questions.**

20. As with all applications for immigration benefits, the applicant bears the burden of proof to establish eligibility for asylum. *See also* INA § 291; *Matter of Acosta*, 19 I&N Dec. 211, 215 (BIA 1985). As noted above, to start the process applicants must submit an I-589 application which asks the applicant for basic biographical information and a statement on the nature and details of their claim. Applicants may also submit a supporting declaration attached to the I-589 and any documents in support of his or her case during the interview.

21. In the asylum and refugee context, however, applicants often face special difficulties presenting evidence to support their application. The applicant may have been forced to flee without an opportunity to gather documents, or it may have been dangerous for the applicant to carry certain documents, such as a written threat or identification documents. In these cases, the interview is particularly important because often testimony is the only evidence the applicant will have to establish large parts of his or her claim. Consequently, the oral testimony at the interview, along with the information contained in the application form, will often be the most critical evidence the officer will gather and evaluate to make her decision. It is the officer's duty to elicit as much detail as possible during the interview.

### The Reason and Significance Of The Designation Of "No Show" Even Though The Applicant Is Present For The Interview

22. As an initial matter, regulations provide that an applicant may not be eligible to be granted employment authorization if he or she fails to appear for a scheduled asylum interview or hearing before an immigration judge unless he or she demonstrates that the failure to appear was the result of exceptional circumstances. *See* 8 C.F.R. 208.7(a)(4). The failure to appear may be excused if, within 45 days after the missed interview, the applicant demonstrates "good cause" for failing to appear. In all cases, a request to reschedule an interview or a missed interview is considered a delay caused or requested by the applicant. *See* 8 C.F.R. 208.7(a)(2); *See also Establishing Good Cause or Exceptional Circumstances*, available at https://www.uscis.gov/humanitarian/refugees-asylum/asylum/establishing-good-cause-or-exceptional-circumstances.[2]

23. It sometimes occurs that even though the applicant appears for their interview, they are unable to proceed. For example, the applicant's lawyer may not have appeared, or they were unable to bring the required interpreter, or they need more time to gather supporting documents. In these circumstances, the Asylum Office will denote the applicant in RAPS as a "no show." This is because RAPS utilizes a limited number of codes to reflect what occurred. There is no code, for example, for a situation where an attorney instructed his client not to answer questions. The use of the "no show" code does not mean that the alien failed to appear, but that the application could not proceed due to the fault of the applicant.

### Applicant's Rights of Appeal

24. An applicant who disagrees with the Asylum Office's decision, including a "no show,"

---

[2] These provisions were enacted as part of the settlement agreement reached in *B.H., et. al. v. USCIS, et al.*, No CV11-2108-RAJ (E.D.Wsh. Sept. 20, 2013).

may request that the Asylum Office reconsider the decision. Again, if an alien is deemed a "no show," the Asylum Office will issue her a notice explaining that she has 45 days to contact the office to reschedule her interview. If the applicant fails to do so, the Asylum Office will then issue a referral for the applicant to appear in immigration court. Once in immigration court, the applicant may again submit an application for asylum which the IJ will review *de novo*. The immigration judge does not have appellate review over the Asylum Offices decisions. If the immigration judge denies asylum and orders the applicant removed, the applicant may file an appeal with the Board of Immigration Appeals. 8 C.F.R. § 1003.1(b). If that appeal is denied, the applicant may file a petitioner for review with the appropriate circuit court of appeals. 8 U.S.C. § 1252(g)(5).

**Asylum and Employment Authorization**

25. Asylum seekers are generally not eligible for public benefits and are expected to support themselves during the asylum adjudication process. Should they choose to work, asylum applicants must secure an employment authorization document. 8 U.S.C. § 1324a. An asylum applicant is eligible to file an application for employment authorization (Form I-765) 150 days after filing the asylum application, provided the application has not been denied by either an Asylum Officer or an immigration judge. 8 C.F.R. § 208.7(a)(1). The Government must issue the alien an employment authorization upon passage of 180 days from the date of the application if no decision on the application has been made, except where the alien has caused the delay in the adjudication. 8 C.F.R. § 208.7(a)(1 ).

26. Prior to 1995, regulations provided for the issuance of employment authorization documents to those who filed "non-frivolous" asylum applications. 8 C.F.R. § 274.12(c)(8) (1994). Regulations further provided for the issuance of employment authorization if the Government failed to adjudicate the asylum application within 90 days. *Id.* In the early 1990s,

nearly two-thirds of applications were not decided in 90 days, with the result being that INS personnel began mailing employment authorization to applicants upon receipt of the asylum application, because those applicants certainly would not have a timely adjudication. David Martin, *Making Asylum Policy: The 1994 Reforms*, 70 Wash. Law. Rev. 725, 734 (1995). Consequently, most claimants would receive employment authorization within a few weeks of filing.

27. This employment authorization would then be valid for years before the application was fully adjudicated. As the asylum caseload and corresponding processing times grew, so did the filing of fraudulent, otherwise non-meritorious, or frivolous claims in order to secure employment authorization and by 1993, as the number of asylum applications grew to well over 300,000.

28. To address this issue, the former Immigration and Naturalization Service instituted a series of regulatory reforms that, among other things, extended the waiting period for employment authorization to 180 days in order to detach asylum applications from employment authorization. 8 C.F.R. § 208.7(a)(3).

29. The agency also implemented a scheduling system known as "Last-In-First-Out" ("LIFO"). Under this system, the Asylum Division scheduled recently filed cases for interview ahead of older case. By giving priority to the newest cases, applicants were on notice that filing asylum applications solely to obtain work authorization carried a risk that their cases would be heard quickly and that their efforts would be fruitless. In other words, LIFO reduced the incentive engendered by the backlog to file fraudulent or otherwise non-meritorious asylum claims just to obtain EADs by scheduling new cases sooner rather than later.

30. Starting in 2014, however, the surge of unauthorized migrants crossing the southwest border placed enormous burdens, as explained below, on the Asylum Division's resources that

required a change in the scheduling system from LIFO to "First-In-First Out" ("FIFO") whereby cases were scheduled in the order that they were filed.

31. Besides responsibility for adjudicating affirmative asylum applications, the Asylum Division is responsible for conducting credible and reasonable fear interviews of aliens apprehended at the border. The Asylum Division also has original jurisdiction over applications for asylum filed by Unaccompanied Alien Children ("UAC"). The dramatic increase in the number of these cases, which fall outside of the regular scheduling system, required the reallocation of the Asylum Division's limited number of Asylum Officers away from the adjudication of affirmative asylum claims. With very few officers adjudicating affirmative asylum applications, the LIFO scheduling system was no longer an effective tool for discouraging fraudulent or otherwise non-meritorious applications. Consequently, in 2014, the Asylum Division changed its scheduling system to FIFO.

32. Since that change in scheduling in 2014, the number of affirmative applications filed nationally per year has increased from 41,024 in 2014 to 261,024 in 2017. Consistent with its prior experience with backlogs, the increase in affirmative filings and a current backlog of several years has resulted in an increase in fraudulent or otherwise non-meritorious filings to obtain employment authorization. *See, Immigrants Claim Lawyers Defrauded Them and They May Be Deported*, Liz Robbins, New York Times, May 3, 2018, https://www.nytimes.com/2018/05/03/nyregion/immigrants-lawyers-defrauded-deportation.html (describing how lawyers filed false asylum claims without their client's knowledge in order to obtain employment authorization); *New Jersey Disbars NY Attorney Over Immigration Fraud Conviction*, Jeannie O'Sullivan, Law 360, April 13, 2018 (describing ethics cases in which an attorney obtained employment authorization for 10 undocumented immigrants by filing false asylum applications).

33. By 2018, the surge at the border and the need to divert resources to credible and reasonable fear case abated to such a degree that the Asylum Division was able to return Asylum Officers to the adjudication of affirmative asylum claims. Able to adjudicate many more affirmative cases, on January 29, 2018, the Asylum Division announced that it would return to the LIFO scheduling system as a means to discourage fraudulent or otherwise non-meritorious filings to obtain work authorization and the limit the further increase in the backlog. *See* https://www.uscis.gov/ news/news-releases/uscis-take-action-address-asylum-backlog.

**Reasons Desmond Fitzgerald did not want his client to have answered questions during the interview.**

34. The Asylum Division has no way to divine why Mr. Fitzgerald does not want his client to testify. Given that his client has the burden of establishing eligibility for asylum, the refusal to have his client answer question at the interview is, frankly, perplexing.

35. That being said, certain observations about this case can be made. First, Mr. Fitzgerald filed his client's application in December 2017, at a time when the agency was employing the FIFO scheduling system. At that time, applications at the Boston sub-office were facing a 3.5 year delay. If the Asylum Office had continued using the LIFO system, Mr. Fitzgerald's client would have received an employment authorization sometime in June 2018 which she would have had for three years until her asylum interview. By scheduling Mr. Fitzgerald's client for an interview in March 2018, she no longer had the chance to obtain an employment authorization simply because of delay in scheduling her asylum interview.

36. Further, Mr. Fitzgerald's client's application for asylum, form I-589, is utterly devoid of any information regarding the basis of her asylum claim. Indeed, all the boxes in which she could explain the reason for her fear of return to El Salvador, whether past persecution or fear of future persecution, were left blank save for Part B., Q. 1. B, in which Mr. Fitzgerald's client simply

states "My US Citizen children will suffer an extreme and exceptionally unusual hardship if I return to the United States." See Ex. A. This is a very curious choice of words.

37.     The term "extreme and exceptionally unusual hardship" is actually the legal standard used in application for cancellation of removal, a form of immigration relief that is separate and apart from asylum. *See* 8 U.S.C. § 1229b(b). Pursuant to the INA, an alien who is in removal proceedings may be eligible for cancellation of removal and receive lawful permanent resident status if they meet certain criteria, including residence in the United States for ten years prior to the issuance of a the Notice to Appear, and United States citizen children. This benefit is only available to aliens placed in removal proceedings under 8 U.S.C. § 1229a before the immigration court, and is not something that can be applied for before USCIS. Consequently, along with frivolous, fraudulent or otherwise non-meritorious asylum filings to obtain work authorization, the agency has noticed an increasing number of so-called "cancellation cases" – asylum applications filed by individuals more than ten years after entry in order to obtain an NTA placing the alien in removal proceedings where the alien may apply for cancellation of removal.

38.     Notably, Mr. Fitzgerald's client's I-589 states that she entered the United States in 2002 and has two U.S. citizen children. *See* Ex. A. Because the Asylum Office has designated her a "no-show" and she is out of status, this office must now issue a referral and NTA for Mr. Fitzgerald's client to appear in immigration court for removal proceedings. Once in front of the immigration judge, she may apply for cancellation of removal. But because the Asylum Office designated Mr. Fitzgerald's client as a "no-show," and because she did not adequately respond to the 45-day notice to request a new interview, the employment authorization clock is now stopped and she is ineligible for employment authorization pending proceedings before the immigration

judge.[3]

**Advantages For Not Answering Questions During The Interview.**

39. Given that the applicant has the burden of proof and persuasion at the interview, I know of no advantages to not answering an Asylum Officer's questions at an interview. Further, had Mr. Fitzgerald's client answered the questions, and the Asylum Office decided to refer her to the immigration court, the clock on her employment authorization would have continued to run and she may have obtained employment authorization.

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury that the foregoing is true and correct.

Executed on: June 6, 2018

Meghann Boyle
Director, Boston Asylum Sub-office,
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

---

[3] On March 15, 2018, this Office sent Mr. Fitzgerald a Failure To Appear Warning. Ex. B. In a letter dated March 21, 2018, Mr. Fitzgerald responded only that "the statements in [the Warning] are false and that our client appeared for her interview at the date and time it was scheduled." Ex. C. Although he requested an appointment to complete the interview, he failed to provide a good cause explanation for his client's non-cooperation with the interview.